# ATTACHMENT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## LEXINGTON

**CRIMINAL ACTION NO. _____**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**V.**                                                **FACTUAL BASIS**

**ERIC CHRISTOPHER CONN**                                        **DEFENDANT**

The United States could prove the following facts that establish the essential elements of the offense(s) beyond a reasonable doubt, and Eric Christopher Conn ("Defendant") admits these facts:

### A. Background

1.      At all times relevant to this Factual Basis, until approximately March 2017, Defendant was an attorney licensed to practice law in Kentucky and practiced law at Eric C. Conn, PSC ("the Conn Law Firm"), of which he was president and the sole shareholder. The Conn Law Firm, established in 1995, was a professional service corporation maintaining a principal office in Stanville, Kentucky that represented individuals throughout the Eastern District of Kentucky, and elsewhere, seeking Social Security disability benefits ("Claimants").

2.      As part of his practice, Defendant assisted Claimants in filing applications with field offices of the Social Security Administration ("the SSA"), primarily the SSA field office located in Prestonsburg, Kentucky ("Prestonsburg Field Office"), as well as by

1

Defendant's Initials: _____

representing Claimants during the initial claims process before Kentucky's Disability Determination Services ("DDS"), located in Frankfort, Kentucky. In the event DDS denied benefits to Claimants, Defendant, through the originating SSA field office, typically requested hearings, to seek again an award of benefits, with the SSA's Office of Disability Adjudication Review ("ODAR") and represented Claimants during the hearing process.

3.      In the event Claimants were awarded benefits, commonly referred to as a "favorable decision," at either the DDS level or ODAR level, and had agreed to representation by Defendant, Defendant was awarded representative's fees. These representative's fees were either twenty-five percent of the total amount of benefits owed to Claimants, or the maximum amount permitted by the Social Security Act, which was between approximately $5,300 and $6,000. Claimants typically received their monthly disability benefits through interstate electronic funds transfers, including within Fleming County, in the Eastern District of Kentucky, and Defendant exclusively received his representative's fees by United States Treasury check, which was delivered to the Conn Law Firm via the United States Postal Service.

**B. Huntington ODAR**

4.      Beginning at least as early as 2004, and continuing through October 2011, all requests for hearings filed with the Prestonsburg Field Office were automatically forwarded to the ODAR located in Huntington, West Virginia ("Huntington ODAR"). Between 2004 and 2011, the Huntington ODAR was staffed by various SSA Administrative Law Judges ("ALJs"), including, and for the entirety of that period, ALJ David Black Daugherty ("Daugherty"). Although the Huntington ODAR was principally

Defendant's Initials: ⎣⎣⎣

located in Huntington, West Virginia, the Huntington ODAR also maintained an unstaffed satellite office in Prestonsburg, Kentucky ("Prestonsburg Satellite ODAR"), which required ALJs serving at the Huntington ODAR to periodically travel to Prestonsburg, Kentucky to adjudicate claims of disability.

### C. Contracted Medical Professionals & RFCs

5.     When Claimants' applications were denied by DDS, and upon requesting hearings with the Prestonsburg Field Office, Defendant routinely contracted with medical professionals to perform either physical or mental evaluations of Claimants, as well as prepare accompanying evaluation reports. Additionally, Defendant requested that the evaluating medical professional also prepare accompanying medical source statements, commonly referred to as Residual Functional Capacity forms ("RFCs"), which sought to quantify Claimants' remaining ability to perform work. Upon completion of the evaluation reports and the accompanying RFCs, Defendant submitted the same to the Huntington ODAR in support of disability determinations.

### D. Alfred Bradley Adkins & Mental Pre-Completed RFCs

6.     In or around September 2004, Defendant contracted with Alfred Bradley Adkins, Ph.D. ("Adkins"), a clinical psychologist, to perform mental evaluations of Claimants, as well as prepare the accompanying evaluation reports and RFCs. When Defendant contracted with Adkins, Defendant told Adkins that the evaluation reports and RFCs would be submitted to the SSA in support of disability determinations, and Defendant maintained this understanding with Adkins throughout the course of their relationship. Defendant repeatedly emphasized to Adkins that the RFCs were of paramount

3

Defendant's Initials: 4 ( (

importance as those were the documents most heavily relied upon by the Huntington ODAR ALJs in making disability determinations. As a reflection of Adkins' knowledge of the importance of the RFCs to the disability determination process and to Defendant, Adkins refused to sign the RFCs until he received payment for his services from Defendant.

7.      Although Adkins' evaluation reports indicated that Adkins' evaluations spanned three and a half hours and that Adkins administered IQ tests to Claimants, in reality, regarding evaluations conducted at the Conn Law Firm, Adkins' evaluations did not span more than thirty minutes, and Adkins did not appropriately administer IQ tests, but rather estimated Claimants' IQs. Adkins falsified the results of IQ tests in his evaluation reports to make the Claimants appear more disabled.

8.      When Adkins initially completed the RFCs at Defendant's request, Adkins indicated the Claimants were so disabled that they were unable to perform any work whatsoever. Adkins' early attempts to complete the RFCs caused Defendant to confront and counsel Adkins that completing the forms in such a way would cause Adkins to lose his credibility with the Huntington ODAR ALJs. Defendant then instructed Adkins on how to complete the RFCs so that the RFCs appeared credible.

9.      When Adkins next completed the RFCs, Adkins indicated that Claimants were not disabled sufficiently to warrant findings of disability. Adkins' second attempt to complete RFCs caused Defendant to remind Adkins that "[Defendant was] in the *disability business*." At Defendant's suggestion, Adkins then altered the RFCs to reflect that Claimants had conditions sufficiently debilitating to justify awarding disability benefits.

4

Defendant's Initials: _U_C_L_

10.     Thereafter, beginning in or around 2006, because Adkins said he disliked completing the RFCs, Adkins told Defendant, "Check whatever you want [on the RFCs] and sign it for me; it's all bulls--t anyway." Defendant declined to sign Adkins' name to the RFCs, but Defendant nevertheless completed the RFCs, eventually creating five templated versions addressing mental disability ("Mental Pre-completed RFCs"). These Mental Pre-completed RFCs were sufficiently debilitating so that Claimants on whose behalf they were submitted plainly appeared disabled, irrespective of Claimants' actual ability to perform work.

11.     Upon Defendant asking Adkins to perform mental evaluations of Claimants, Adkins would also ask Defendant if Daugherty was the ALJ assigned to the case. In those instances, Adkins, believing Daugherty would grant disability benefits regardless of the thoroughness of the evaluation, drafted perfunctory evaluation reports. Notwithstanding the ALJ assigned to a particular case, beginning in or around 2006 and continuing through in or around May 2011, Defendant provided Adkins with Mental Pre-completed RFCs for signature, which Adkins signed (totaling more than 200 of them) without alteration. Specifically, on or about September 9, 2008, Adkins signed a Mental Pre-completed RFC for Claimant J.F, reflecting that Claimant J.F. had mental limitations considered disabling by the SSA. Defendant, knowing these signed Mental Pre-completed RFCs were fraudulent, nevertheless submitted the same, together with the perfunctory evaluations reports containing falsified IQ test results that were also fraudulent, to the Huntington ODAR in support of disability determinations. Specifically, on or about September 28, 2008, on Claimant J.F.'s behalf, Defendant caused the signed fabricated medical document

5

Defendant's Initials: _____

to be submitted to the Huntington ODAR in support of a disability determination. When

Adkins signed the forms, both he and Defendant understood that his signature indicated

that these were genuine assessments made by Adkins based on an examination, when they

were neither genuine assessments nor were they made by Adkins.

      12.    At the time Defendant contracted with Adkins, and throughout the course of

their relationship, Adkins also performed mental evaluations for DDS. Adkins, concerned

that Defendant might ask him to evaluate Claimants that he previously evaluated for DDS,

instructed Defendant, "Be sure to tell me if I've already seen a person for DDS, so I can

make it a little different."

### E.  Unindicted Co-Conspirators, Physical Pre-Completed RFCs, Falsified Summary Reports & Falsified X-Ray Reports

      13.    At or around the same time, Defendant pre-completed, ultimately fabricating

approximately fifteen templated versions of, RFCs addressing physical disability

("Physical Pre-completed RFCs") indicating Claimants had limitations considered

disabling by the SSA, irrespective of Claimants' actual ability to perform work. Beginning

in or around 2005 and continuing through in or around May 2011, Defendant provided the

same to other medical professionals, including Unindicted Co-conspirator A and

Unindicted Co-conspirator B, with whom Defendant contracted to perform physical

evaluations of Claimants. Upon Unindicted Co-conspirator A, Unindicted Co-conspirator

B, and other medical professionals signing, without alteration, these Physical Pre-

completed RFCs, Defendant, knowing these Physical Pre-completed RFCs were

fraudulent, nevertheless submitted the same to the Huntington ODAR in support of

Defendant's Initials: _____

disability determinations. These Physical Pre-completed RFCs were sufficiently debilitating so that ALJs receiving these documents in support of disability determinations, if accepted as true, would necessarily award benefits to Claimants on whose behalf they were submitted.

14.     On occasion, beginning in or around 2006 and continuing through in or around May 2011, when Claimants missed appointments with Unindicted Co-conspirator B, Defendant falsified medical reports purporting to summarize Claimants' existing medical records ("Falsified Summary Reports") indicating Claimants had limitations considered disabling by the SSA, irrespective of Claimants' actual ability to perform work, and provided the same to Unindicted Co-conspirator B for signature. Unindicated Co-conspirator B signed the Falsified Summary Reports, without having first reviewed the appropriate medical records, and returned the same to Defendant for submission to the SSA. Defendant, knowing these Falsified Summary Reports were fraudulent, nevertheless submitted the same to the Huntington ODAR in support of disability determinations.

15.     Moreover, and on occasion, beginning in 2008 and continuing through in or around May 2011, Defendant sent Claimants to Clinic A, a medical facility located in the Eastern District of Kentucky, to have X-Rays taken, and further instructed Clinic A not to read the X-Ray images. Defendant then falsified medical reports purportedly summarizing the X-Ray images ("Falsified X-Ray Reports") indicating Claimants had limitations considered disabling by the SSA, irrespective of Claimants' actual ability to perform work, and provided the same to Unindicted Co-conspirator B for signature. Unindicated Co-conspirator B signed the Falsified X-Ray Reports, without having first reviewed the X-Ray

7

Defendant's Initials: ___

images, and returned the same to Defendant for submission to the SSA. Defendant, knowing these Falsified X-Ray Reports were fraudulent, nevertheless submitted the same to the Huntington ODAR in support of disability determinations.

### F. David Black Daugherty

16.    In or around October 2004, as Defendant's practice was expanding throughout the Eastern District of Kentucky, while at the Prestonsburg Satellite ODAR, Defendant was confronted by Daugherty. During that encounter, Daugherty remarked to Defendant that he (Defendant) was the beneficiary of many of Daugherty's decisions. Upon giving that reminder, Daugherty then solicited Defendant to give Daugherty $5,000 to aid a Daugherty-family member with expenses associated with addiction rehabilitation. Because Defendant did not agree to do so at that time, later that afternoon, Daugherty contacted Defendant by telephone and remarked that Defendant was making a significant amount of money on decisions rendered by Daugherty, and that Daugherty "[needed] to have that money." Defendant, knowing that the success of his SSA disability practice depended on having a good relationship with Daugherty, assented and, soon thereafter, paid Daugherty $5,000, in cash, at the Prestonsburg Satellite ODAR.

17.    The following month, Daugherty again contacted Defendant by telephone and again stated that he (Daugherty) needed money for a Daugherty-family member's addiction rehabilitation. Upon Defendant asking Daugherty how much money was needed, Daugherty informed Defendant that Daugherty needed "about $10,000 *a month*." Defendant, having already paid Daugherty once and understanding that this payment had to be made for continued success in cases pending with Daugherty, agreed to pay

Defendant's Initials: ____

Daugherty $10,000, in cash, and did so that same month when Daugherty traveled to the Prestonsburg Satellite ODAR. At the time Defendant paid Daugherty, Daugherty remarked, "let's not be stupid here," cautioning Defendant to be careful in withdrawing the money from the bank (because Daugherty was aware of banks' reporting obligations for certain transactions), and advising Defendant that he (Daugherty) would not deposit all the money or do so all at once (for the same reason).

18.     Thereafter, beginning in or around December 2004 and continuing through in or around April 2011, Defendant paid Daugherty monthly for awarding disability benefits to Claimants. Daugherty typically awarded benefits to Claimants in approximately twenty to thirty-five of Defendant's cases per month, and because Defendant ultimately paid Daugherty $400 per favorable decision, such resulted in Defendant paying Daugherty between $8,000 and $14,000, in cash, per month. During this period, and at Defendant's direction, Conn Law Firm employees periodically withdrew cash from the Conn Law Firm company bank account in increments below $10,000, so as to intentionally avoid initiating the bank's obligation to file a Currency Transaction Report with the Internal Revenue Service. This practice also formed part of the effort to conceal the nature, source, and purpose of the withdrawals and the payments to Daugherty.

19.     The United States Treasury checks representing Defendant's representative's fees for the Claimants, which had been delivered to the Conn Law Firm via the United States Postal Service, were deposited into the Conn Law Firm company bank account throughout this time period, as Defendant knew. Such funds were thereafter used not only to fund the above-described withdrawals and payments to Daugherty as part of the

9

Defendant's Initials: ⧸⊦⎰

fraudulent scheme, but also to make purchases and conduct other expenditures greater than $10,000.

20.     As a result of being financially incentivized, Daugherty not only decided Defendant's cases that were assigned to him per Huntington ODAR policy, but also sought out Defendant's unassigned cases as well as cases that had been assigned to other Huntington ODAR ALJs, and either assigned or reassigned those cases to himself. In those instances when Daugherty either assigned previously unassigned cases or reassigned cases from other Huntington ODAR ALJs, Daugherty awarded benefits to Claimants without holding hearings, a practice commonly referred to as granting decisions "On the Record," or "OTR."

21.     In order to justify Daugherty granting OTR decisions, Claimants' files needed to contain medical evidence purportedly sufficient to indicate Claimants had limitations considered disabling by the SSA, thereby averting the need for a hearing. Thus, it became imperative for Defendant to submit medical evidence that plainly justified a finding of disability. Consequently, and on a monthly basis, Daugherty contacted the Conn Law Firm and provided the identity of Claimants for whom Daugherty intended to award benefits, and specifically requested that Defendant provide to Daugherty either mental or physical evidence that was sufficiently debilitating. These monthly telephone calls were memorialized by Conn Law Firm employees and these lists of Claimants' names and the requested type of medical evidence, commonly referred to as "DB Lists," were circulated monthly to various employees within the Conn Law Firm. On occasion, Defendant and

10

Defendant's Initials: _CL_

other Conn Law Firm employees also requested additions to the DB Lists, and Daugherty granted those Claimants benefits, as well.

22.     During this relationship with Daugherty, Defendant contracted with and submitted the evaluation reports together with Mental and Physical Pre-completed RFCs signed by Adkins, Unindicted Co-conspirator A, Unindicted Co-conspirator B, and other medical professionals to Daugherty in support of disability determinations, as described above. Defendant typically submitted this fraudulent documentation to Daugherty via interstate facsimile or wire transmissions from the Conn Law Firm to the Huntington ODAR.

23.     Even after Daugherty began to award benefits via OTR decisions for some of Defendant's cases, Daugherty continued to hold hearings at the Prestonsburg Satellite ODAR for Defendant's cases that were originally assigned to Daugherty. Then, in or around 2006, because Defendant's practice was so expansive and because the vast majority of the hearings Daugherty held at the Prestonsburg Satellite Office were for cases associated with Defendant, Daugherty, fearing it would draw unwanted attention and because other claimant representatives were complaining, decided to discontinue holding hearings for Defendant's cases and grant favorable decisions via OTR decision exclusively. Specifically, on or about October 1, 2008, Daugherty issued an OTR decision awarding disability benefits to Claimant J.F., citing the Mental Pre-completed RFC created by Defendant and signed by Adkins.

24.     Although Defendant previously made payments to Daugherty exclusively at the Prestonsburg Satellite ODAR, because Daugherty discontinued traveling to

11

Defendant's Initials: _____

Prestonsburg, Defendant agreed with Daugherty to make cash payments to Daugherty in Louisa, Kentucky, approximately half-way between the Huntington ODAR and the Prestonsburg Satellite ODAR.

25.     Beginning in or around 2006 and continuing through in or around April 2011, save three occasions Defendant recalls, Defendant met Daugherty monthly at either a gas station or in a restaurant parking lot in Louisa, Kentucky and provided Daugherty with an envelope containing the amount of cash corresponding to the number of OTR decisions Daugherty was granting that month. Daugherty would in turn provide Defendant with an envelope containing advance copies of his OTR decisions.

26.     During that timeframe, Defendant met Daugherty, on one occasion, at Defendant's office in Stanville, Kentucky, and, on one occasion, at Defendant's satellite office in Ashland, Kentucky and delivered the monthly cash payments to Daugherty. Moreover, on one occasion, in or around 2006, Defendant brought a Conn Law Firm employee ("Conn Law Firm Employee A") with him to meet Daugherty in Huntington, West Virginia, for the purpose of not only delivering Daugherty's monthly payment, but also to see Daugherty's new boat. After viewing the boat, and outside the presence of Conn Law Firm Employee A, Defendant delivered the monthly cash payment to Daugherty, which was concealed in an envelope, outside of a restaurant located in Huntington, West Virginia.

27.     During the course of this arrangement, in or around January 2008, Daugherty contacted Defendant by telephone and confronted Defendant about the repetitive submission of the Physical Pre-completed RFCs. Daugherty advised Defendant, "This isn't

12

Defendant's Initials: _C_ / _l_

going to work," and instructed Defendant to create and submit a wider variety of Physical Pre-Completed RFCs. During that same telephone call, Daugherty criticized the quality of the Physical Pre-completed RFCs, remarking to Defendant, "Who's filling these out for you? It must be an eighth grader writing these for you." At that time, Defendant discontinued using the original five versions of the Physical Pre-completed RFCs, created ten new versions of Physical Pre-completed RFCs, and submitted these newer versions to Daugherty in support of disability determinations. The new ten Physical Pre-completed RFCs, created by Defendant, like their predecessors, reported limitations considered disabling by the SSA, irrespective of Claimants' actual ability to perform work.

### G. Scope of Fraudulent Conduct

28.     Beginning in or around 2005 and continuing through in or around May 2011, Defendant knowingly and willfully submitted thousands of Mental and Physical Pre-completed RFCs, Falsified Summary Reports, and Falsified X-Ray Reports to the Huntington ODAR in support of disability determinations. In authoring well over 1,700 favorable decisions for Claimants wherein Defendant made cash payments to Daugherty and had submitted Mental and Physical Pre-completed RFCs in support of disability determinations, and despite Daugherty's knowledge of the fraudulent nature of these documents, nevertheless, Daugherty directly relied upon same, often excerpting language from the Mental and Physical Pre-completed RFCs into his decisions.

29.     Daugherty's favorable decisions, as well as decisions authored by other ALJs, that were predicated upon the fraudulent documents, obligated the SSA to pay in excess of $550,000,000 in lifetime benefits to the Claimants on whose behalf they were

Defendant's Initials: _L(_

submitted. These decisions actually caused the SSA to pay approximately $72,574,609 in disability benefits to Claimants that the SSA has otherwise determined these Claimants were not entitled to receive, based upon a calculation completed by the SSA for approximately 1,700 claimants as of March 9, 2018. Specifically, beginning on or about December 3, 2008, and continuing through in or around March 2016, based on the favorable decision rendered by Daugherty, the SSA issued monthly disability benefits to Claimant J.F., at an account held by Claimant J.F. at Peoples Bank, in the Eastern District of Kentucky. Additionally, these decisions caused the Centers for Medicare and Medicaid Services to pay approximately $59,993,322.44 and Kentucky Medicaid to pay approximately $400,000 in health care benefits to Claimants that SSA has otherwise determined the Claimants were not entitled to receive. Moreover, as a result of Defendant submitting the fraudulent documents, and disability benefits ultimately being awarded to Claimants predicated on the same, Defendant received approximately $5,750,404.46 in representative fees for those approximately 1,700 claimants.

30.     In other words, Defendant did knowingly and intentionally conspire and agree with other persons known, including Daugherty and Adkins, to defraud the United States by impairing, impeding, obstructing, and defeating the lawful governmental functions of the SSA, specifically the SSA's evaluation, consideration, review, and adjudication of disability claims in a way that was free from corruption, partiality, improper influence, bias, dishonesty, and fraud.

Defendant's Initials: ___

**H. *The Wall Street Journal* Article**

31.     On May 19, 2011, *The Wall Street Journal* published an article ("Article") critical of the Huntington ODAR, particularly of the practices of Daugherty. The Article focused on Daugherty's exceedingly high rate of approving disability benefits, as well as his seemingly inappropriate relationship with Defendant.

32.     Subsequent to the Article's publication, Defendant spoke with Daugherty only on few occasions, despite Daugherty's repeated efforts to contact him. One occasion was the day the Article was published. On that day, Defendant received a telephone call from Daugherty while Defendant was in Las Vegas, Nevada. During that telephonic conversation, as Defendant recalls, Daugherty remarked to Defendant, "If we keep our mouths shut and don't say anything against each other, we've got nothing to worry about. Don't get scared and run off to the Feds."

**I.  Destruction of Records**

33.     After the Article's publication, on or about May 25, 2011, federal agents with the SSA, Office of the Inspector General ("OIG") met with Defendant at the Conn Law Firm and made inquiries regarding Defendant's relationship with Daugherty, ultimately notifying Defendant of the existence of a federal investigation. Soon thereafter, in or around June 2011, Defendant, knowing that the OIG was investigating the nature of Defendant's relationship with Daugherty, directed Conn Law Firm employees to delete from computers or destroy hard copies of both the Mental and Physical Pre-completed RFCs that were maintained at the Conn Law Firm, as well as to delete from office computers any locatable DB Lists, and other Daugherty-related documents. Further, in an

Defendant's Initials: ___

effort to conceal potential incriminating evidence of his illicit relationship with Daugherty, Defendant also directed employees to destroy at least one computer hard drive, which was done on the premises of the Conn Law Firm.

### J. Retaliation

34.     Also after the Article's publication, the Huntington ODAR reshuffled its management staff, including temporarily demoting then-Chief ALJ Charlie Paul Andrus ("Andrus"). In or around June 2011, Andrus, knowing that a Huntington ODAR employee ("SSA Employee A") had provided information to both the OIG and *The Wall Street Journal* regarding Defendant's relationship with Daugherty, which ultimately led to Andrus' temporary demotion, met with Defendant in Prestonsburg, Kentucky. During that meeting, Andrus identified SSA Employee A to Defendant, and further suggested that SSA Employee A needed to be discredited. Andrus, together with Defendant, formulated a scheme to have SSA Employee A terminated from his/her employment with the Huntington ODAR, essentially by having SSA Employee A followed, and filmed not working, when SSA Employee A was scheduled to be working from home.

35.     Accordingly, Andrus, through another ODAR employee, provided Defendant with SSA Employee A's home address and work schedule. Upon receiving the schedule, Defendant sent various Conn Law Firm employees to SSA Employee's A's residence in an effort to film SSA Employee A not working from his/her residence. After several failed attempts to film SSA Employee A violating his/her work-from-home schedule, Defendant directed a Conn Law Firm employee to film SSA Employee A at any

Defendant's Initials: _____

time, and at any location, and make the recording appear as if SSA Employee A had violated the work-from-home policy.

36.     In or around August 2011, a Conn Law Firm employee filmed SSA Employee A outside the Huntington ODAR, and made the recording appear as if the recording was created on a day that SSA Employee A was scheduled to work from home. Defendant notified Andrus of the same, and then, on or about August 16, 2011, directed that the film be mailed from the Conn Law Firm to the Huntington ODAR in an effort to have SSA Employee A's employment with the Huntington ODAR terminated.

37.     Defendant knew it was wrong to enter into an agreement with Andrus to interfere with SSA Employee A's employment and livelihood, but he together with Andrus, wanted to retaliate against SSA Employee A for providing truthful information to law enforcement officers and *The Wall Street Journal* about the possible commission of Federal offenses.

**K. Indictment**

38.     As a result of the foregoing conduct, on April 1, 2016, in *United States v. Eric Christopher Conn, et al.*, 5:16–CR-22 (E.D. Ky.) (J. Reeves), a federal grand jury empaneled in the Eastern District of Kentucky returned an eighteen-count indictment charging Defendant, together with Daugherty and Adkins, with various felony offenses, including conspiracy to commit mail fraud and wire fraud in violation of Title 18, United States Code, Section 1349 ("Indictment"). That same day, upon the Indictment's return, the Court issued a warrant for Defendant's arrest.

Defendant's Initials: _____

39.     On or about April 4, 2016, Defendant was arrested pursuant to the warrant, and made his initial appearance the following day. Following a detention hearing, on April 12, 2016, the Court ordered Defendant to be confined via home incarceration at his residence in Pikeville, Kentucky, in the Eastern District of Kentucky, with active electronic monitoring, pending trial, and further ordered him to appear in person at all future court hearings ("April Order").

40.     On March 24, 2017, in *United States v. Eric Christopher Conn*, 5:17-CR-43 (E.D. Ky.) (J. Reeves), pursuant to a plea agreement with the United States, Defendant waived indictment and pleaded guilty to a two-count information charging him with theft of government money and paying illegal gratuities, in violation of Title 18, United States Code, Sections 641 and 201(c), respectively ("Preceding Information"). At that time, and in Defendant's presence, the Court scheduled Defendant's sentencing hearing for July 14, 2017, and, in referencing the April Order, further ordered Defendant to remain on home incarceration, with active electronic monitoring, pending sentencing, and to personally appear at all court hearings, including his sentencing hearing.

41.     Thereafter, in conspiring with Curtis Lee Wyatt ("Wyatt") and others to escape custody and to fail to appear at Defendant's July 14, 2017, sentencing hearing, Defendant knowingly and willfully engaged in the following acts:

## L. Investigating Border Crossings

42.     On or about April 22, 2017, Wyatt, at Defendant's direction, drove from Pikeville to Nogales, Arizona, to assess the security measures in place at the pedestrian border crossing between the United States and Mexico ("Nogales Border Crossing"). As

Defendant's Initials: ⟨⟨

Defendant instructed, on or about April 23, 2017, Wyatt entered Mexico at the Nogales Boarding Crossing to determine what identification, if any, was checked by Mexican authorities for individuals entering Mexico. Later that day, Wyatt reentered the United States at the Nogales Border Crossing by presenting his United States passport.

43.    The following day, on or about April 24, 2017, Wyatt, at Defendant's direction, drove to Columbus, New Mexico to assess the security measures in place at the pedestrian border crossing between the United States and Mexico ("Columbus Border Crossing"). That same day, as Defendant instructed, Wyatt entered Mexico at the Columbus Border Crossing to determine what identification, if any, was checked by Mexican authorities for individuals entering Mexico. Later that day, Wyatt reentered the United States at the Columbus Border Crossing by presenting his United States passport. In the days following, Wyatt returned to Pikeville and relayed his findings to Defendant.

**M. Procuring and Managing the Escape Vehicle**

44.    Moreover, on or about May 10, 2017, Wyatt, with funds provided by Defendant and at Defendant's direction, purchased, in cash, a 2002 white Dodge pickup truck ("Vehicle") in Somerset, Kentucky. Also at Defendant's direction, Wyatt had the Vehicle registered in Montana in the name of a limited liability company associated with Defendant and purportedly headquartered in East Helena, Montana.

45.    Thereafter, on or about May 30, 2017, and continuing in his efforts in support of Defendant, Wyatt retrieved the Vehicle from the seller in Somerset and drove the same to Pikeville, parking it on the third level of a particular city parking garage.

19

Defendant's Initials: _C I_

46.    Upon receiving permission from the United States Probation Office ("USPO") to leave his residence in Pikeville for the purpose of preparing to testify at a co-defendant's trial, Defendant traveled to Lexington on June 1, 2017. The USPO authorized Defendant to remain in Lexington through the evening hours of June 2, 2017, but, at that time, required Defendant to return to his residence.

47.    On June 1, 2017, Wyatt, at Defendant's direction, drove the Vehicle from Pikeville to Lexington, parking the same at or near the hotel where Defendant was staying. For the purpose of suppressing the electronic signal emitted from Defendant's electronic monitoring device, Wyatt brought with him a Faraday bag that Defendant had previously ordered and had shipped to Wyatt's residence in Raccoon, Kentucky—and for which Wyatt had downloaded an application onto his cellular telephone in order to test the bag's effectiveness. That evening, Wyatt met Defendant at Defendant's hotel and delivered to him the Faraday bag and the keys to the Vehicle. During the early morning hours of June 2, 2017, Wyatt drove Defendant's other vehicle to Pikeville, leaving the Vehicle in Lexington for Defendant's use.

**N. Escape and Failure to Appear**

48.    On June 2, 2017, at or around 8:00pm, while in Lexington, Defendant severed the Court-ordered electronic monitoring device from his ankle, concealed the device in the Faraday material supplied by Wyatt, and fled the jurisdiction of the Court in the Vehicle delivered to him by Wyatt.

49.    Over the course of the several days following, Defendant drove the Vehicle to Columbus, New Mexico, ultimately abandoning the Vehicle at or near the Columbus

20

Defendant's Initials: _____

Border Crossing. From on or about June 2, 2017, and continuing through on or about December 5, 2017, when Defendant was apprehended in Honduras and returned to the United States, Defendant, without permission from the Court, absented himself from his place of incarceration, and escaped custody.

50.    Despite having received notice of his July 14, 2017 sentencing hearing and despite having been ordered by the Court to appear at that sentencing hearing, Defendant failed to appear. Having concluded that Defendant voluntarily absented himself from the sentencing hearing, the Court sentenced Defendant, *in absentia*, to serve twelve years' imprisonment for the offenses set forth in the Preceding Information.

JOHN P. CRONAN
ACTING ASSISTANT ATTORNEY
    GENERAL
CRIMINAL DIVISION
ATTORNEY FOR THE GOVERNMENT

Date: 6/1/2018           By: _____
                              Dustin M. Davis
                              Trial Attorney

Date: 6/4/18             By: _____
                              Ann Marie Blaylock
                              Trial Attorney

Date: June 4, 18         _____
                              ERIC CHRISTOPHER CONN
                              DEFENDANT

Date: June 4, 2018       _____
                              WILLIS G. COFFEY
                              ATTORNEY FOR DEFENDANT

21

Defendant's Initials: _____